UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---------------------------------------------------------------------- x

| | |
|---|---|
| JONATHAN VILMA, | : |
| | : |
| Plaintiff, | : CIVIL ACTION NO. 12-CV-1283 c/w 12-CV-1718 |
| | : |
| VERSUS | : SECTION: "C" |
| | : |
| | : DIVISION: (3) |
| ROGER GOODELL, ET AL, | : |
| | : JUDGE HELEN G. BERRIGAN |
| Defendants. | : |
| | : MAGISTRATE JUDGE |
| THIS DOCUMENT REFERS TO 12-CV-1718: | : DANIEL E. KNOWLES, III |
| | : |
| JONATHAN VILMA, | : |
| | : **JURY TRIAL DEMANDED** |
| VERSUS | : |
| | : |
| THE NATIONAL FOOTBALL LEAGUE. | : |

---------------------------------------------------------------------- x

## AMENDED COMPLAINT

Plaintiff Jonathan Vilma, by his attorneys, Peter R. Ginsberg Law, LLC and Williams Law Group, LLC, for his Amended Complaint against Defendant National Football League ("NFL"), alleges as follows:

### NATURE OF THE ACTION

1.    This action seeks to vacate a season-long suspension imposed by Commissioner Roger Goodell on July 3, 2012, against Vilma ("Arbitration Award").  Vilma is a professional football player for the New Orleans Saints Football Club ("Saints").

2.    Vilma respectfully requests the Court to vacate the Arbitration Award pursuant to the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, in light of: (1) the NFL having conducted a pretextual and fundamentally unfair arbitration process; (2) the Arbitration Award and process being arbitrary

1

and capricious; (3) the Arbitration Award having failed to draw its essence from the NFL-National Football League Players Association Collective Bargaining Agreement ("NFL-NFLPA CBA"); (4) Goodell's misconduct; (5) Goodell having exceeded his authority; and (6) Goodell's partiality.

3.      Vilma also respectfully requests the Court to temporarily restrain and preliminarily enjoin the NFL from effectuating the threatened suspension pending resolution of the instant action.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331, in that this Court has subject matter jurisdiction to adjudicate claims arising under the Constitution, laws or treatises of the United States.  Federal question jurisdiction exists in this case based on the LMRA.

5.      Venue is proper pursuant to 28 U.S.C. § 1391 and the LMRA.

## THE PARTIES

6.      Vilma is a linebacker for the Saints, an eight-year veteran of the NFL, and a citizen of the State of Florida.  Vilma has been a member of the Saints since 2008 and a Captain of the defense for much of that time.

7.      The NFL is an unincorporated association of 32 Member Clubs, including the Saints, headquartered in New York, New York.

## BACKGROUND

### *The "Bounty Rule" Investigation*

8.      Goodell and the NFL, at Goodell's direction, have accused, and punished, Saints executives, coaches and defensive players for conducting a bounty program during the 2009,

2010 and 2011 Seasons ("Bounty Program") which allegedly involved taking aim at and targeting specific opposing players and offering monetary incentives for injuring those players.

9.      Goodell, in press releases, public statements, and reports to NFL Clubs, as well as in correspondence directed to Vilma, alleged – and announced his own personal conclusions – that Saints coaches and defensive players maintained a Bounty Program whereby players "targeted particular players" for injury, contributed cash into a pool and received "cash payments" for injuring and assuring that previously-designated opposing players could not continue to play in the game.  Goodell also alleged that Vilma held up $10,000 in cash at a Team meeting and offered it to any player who knocked Minnesota Vikings quarterback Brett Favre out of the 2009 NFC Championship Game and offered a similar bounty to any Saints player who injured Arizona Cardinals quarterback Kurt Warner in a 2009 Divisional playoff game.

10.     Goodell and the NFL claim to have reviewed "approximately 18,000 documents totaling more than 50,000 pages" and claim to have conducted extensive witness interviews.

*Vilma's First Offer to Meet With Goodell*

11.     On March 14, 2012, Vilma's counsel offered to meet with Goodell about the accusations against Vilma if Goodell was considering disciplining Vilma.

12.     Vilma's counsel confirmed the offer in a letter dated March 21, 2012.

*Vilma's Second Request to Meet with Goodell and First Request for Evidence*

13.     By email dated March 30, 2012, the NFL requested to interview Vilma concerning the alleged Bounty Program.

14.     In response, Vilma, by letter dated April 2, 2012, agreed to a meeting with the NFL once the NFL provided him with the materials gathered by the NFL "which the NFL contend[ed] provided a basis to investigate Vilma" so that Vilma could prepare for and

understand the scope of the interview.  In the same letter, Vilma offered to provide the NFL with complete "detail[] [of] Vilma's knowledge regarding [the Bounty Program] allegations."

15.    By letter dated April 5, 2012, the NFL refused to provide Vilma with any information or other supposed evidence, claiming "[w]e see no basis upon which it would be appropriate to make any of the material available, and we decline to do so."

16.    The NFL also refused to meet with Vilma's counsel.

***Goodell Imposes Discipline on the Saints***

17.    On March 21, 2012, Goodell imposed punishment on the Saints Organization and Saints personnel.  Goodell:

> a.   fined the Saints $500,000, and required the Saints to forfeit second round draft picks in the 2012 and 2013 NFL Drafts;
>
> b.   suspended Saints Head Coach Sean Payton without pay for the 2012 NFL season and conditioned reinstatement into the NFL on Goodell's personal approval;
>
> c.   suspended Saints General Manager Mickey Loomis without pay for the first eight regular season games of the 2012 season;
>
> d.   suspended former Saints defensive coordinator Gregg Williams indefinitely from the NFL and conditioned reinstatement on Goodell's personal approval; and
>
> e.   suspended Saints Assistant Head Coach Joe Vitt without pay for the first six regular season games of the 2012 season.

18.    Goodell prohibited Loomis, Payton and Vitt from having any contact with the Saints or any person associated with the NFL during their suspensions.

19.     Upon information and belief, Goodell also issued a "gag order" on Williams, prohibiting him from speaking with anyone about the Bounty Program investigation.

20.     Goodell reinforced this effort to deny all but Goodell-approved people with access to information by suspending Payton and Williams from the NFL, pending reinstatement by Goodell, yet another determination that Goodell claims is within his sole discretion and not subject to review or appeal.  By conditioning reinstatement into the NFL on his own personal approval, Goodell effectively prohibited Williams and Payton from communicating with anyone but Goodell-approved people regarding the alleged Bounty Program and the manner and means by which the NFL conducted its investigation.

21.     Despite his contention that he is properly the sole arbitrator  of player discipline in this instance, and notwithstanding that he had yet to entertain any evidence from the Saints players or conduct a hearing for the players regarding the supposed Bounty Program, Goodell, in a March 21 Press Release, issued his personal conclusions and described possible discipline of Saints players:

> … I am profoundly troubled by the fact that players – including leaders among the defensive players – embraced this program so enthusiastically and participated with what appears to have been a deliberate lack of concern for the well-being of their fellow players….  While all club personnel are expected to play to win, they must not let the quest for victory so cloud their judgment that they willingly and willfully target their opponents and engage in unsafe and prohibited conduct intended to injure players.

22.     Goodell, in his March 21 Press Release, repeated the allegations (and his own conclusions), which he had previously made public despite his claimed position as a supposedly neutral and fair arbitrator of such matters, that "several players pledged funds toward bounties on specific opposing players" and that "defensive captain Jonathan Vilma offer[ed] $10,000 to any player who knocked Brett Favre out of the NFC Championship Game in 2010."

23.    Also on March 21, 2012, Goodell sent a Memorandum of Decision to all 32 Member Clubs attempting to justify the punishment he imposed on Saints personnel and, again, showing that he had prejudged the role of the Saints players in the supposed Bounty Program, alleged:

  a.  "several players pledged funds toward bounties on specific opposing players";

  b.  "defensive captain Jonathan Vilma offered $10,000 to any player who knocked Brett Favre out of the NFC Championship Game in 2010"; and

  c.  players "willingly and willfully engage[d] in conduct on the field intended to injure fellow players."

***Goodell Imposes Discipline on Saints Players***

24.    On May 2, 2012, Goodell punished four Saints and former Saints players:

  a.  suspended linebacker Scott Fujita without pay for the first three games of the 2012 regular season;

  b.  suspended defensive end Will Smith without pay for the first four games of the 2012 regular season;

  c.  suspended defensive lineman Anthony Hargrove without pay for the first eight games of the 2012 regular season; and

  d.  suspended Vilma without pay for the entire 2012 regular season.

25.    Goodell, in a May 2 Press Release, repeated and expanded on his previous public statements and conclusions concerning Vilma and the Saints defensive team generally.  Goodell claimed that:

  a.  Vilma "assisted Coach Williams in establishing and founding the [Bounty]

6

program," and "offered a specific bounty - $10,000 in cash – to any player who knocked Arizona quarterback Kurt Warner out of the 2009 Divisional Playoff Game and later pledged the same amount to anyone who knocked Minnesota quarterback Brett Favre out of the 2009 NFC Championship Game";

b. "Saints players of their own accord pledged significant amounts of their own money toward bounties… accepted payments for 'cart-offs' and 'knockouts' of injured opposing players, and that the payout amounts doubled and tripled for playoff games";

c. Vilma "contributed a particularly large sum of money toward the [Bounty] program; specifically contributed to a bounty on an opposing player; demonstrated a clear intent to participate in a program that potentially injured opposing players; [and] sought rewards for doing so"; and

d. Vilma and the other suspended players "willingly and enthusiastically embraced the bounty program… [and] put the vast majority of the money into this program."

26.     Claiming that he was acting pursuant to Article 46, § 1(a)  of the NFL-NFLPA CBA, Goodell advised Vilma of the suspension in a letter dated May 2, 2012  ("May 2 Notice").

27.     Goodell claimed in the May 2 Notice that Vilma's participation in the alleged Bounty Program "constitute[d] conduct detrimental to the integrity of and public confidence in the game of professional football."

***Vilma's Second Request for Evidence and Appeal***

28.     Vilma, pursuant to the NFL-NFLPA CBA, appealed Goodell's suspension by

7

letter dated May 7, 2012.

29.     Having been denied all evidence prior to imposition of the suspension and rebuffed in his efforts to meet with Goodell for a full and fair exchange of information, Vilma made yet another effort to understand the basis of the allegations against him.  By separate letter also dated May 7, 2012, Vilma once again requested "all evidence gathered during the course of the NFL's investigation that supports, corroborates or relates in any way to the many allegations [Goodell] and the NFL ha[d] disseminated in the media regarding [] Vilma's alleged participation in a purported [B]ounty [P]rogram."  Vilma's May 7, 2012 letter requested 17 specific categories of documents or information.

30.     The NFL again refused to provide Vilma with any documents, information or other supposed evidence by letter dated May 23, 2012.  The NFL also informed Vilma that the hearing on his appeal would take place on June 18, 2012 ("Appeal Hearing").

31.     In an email dated June 8, 2012, the NFL confirmed that the Appeal Hearing would commence at 10:00 a.m. on June 18, 2012.

***Vilma's Request for Fairness, Including Access to Witnesses***

32.     By letter to Goodell dated June 15, 2012, Vilma set forth the fundamental flaws in the process invoked to suspend him, concluding that the NFL had "depriv[ed] [him] of a fundamentally fair arbitration hearing."  Included was that the NFL had:

      a.   failed to provide "any evidence related to this matter...";

      b.   refused him access to witnesses; and

      c.   failed to provide an impartial arbitrator who had jurisdiction to proceed with adjudicating the fairness and basis of the threatened punishment.

33.     Vilma's June 15, 2012 letter also requested the NFL to produce all of the

evidence gathered during its investigation and to make available for examination at the Appeal Hearing:

> f.  Goodell;
>
> g.  Payton;
>
> h.  Williams;
>
> i.  Vitt;
>
> j.  Loomis;
>
> k.  Blake Williams, Williams' son and a former Saints defensive coach;
>
> l.  Michael Cerullo, a former Saints defensive coach;
>
> m.  Joe Hummel, NFL Security officer; and
>
> n.  Jeff Miller, NFL Security officer.

34.  Vilma's June 15, 2012 letter was sent to Goodell via email at 9:02 a.m.

*The NFL's Untimely and Insufficient Production of Documents*

35.  Article 46, § 2(f)(ii) of the CBA provides, as a mandatory procedural requirement for hearings conducted to determine whether actions constitute conduct detrimental to football, as follows:

> **Discovery.** In appeals under Section 1(a), the parties shall exchange copies of any exhibits upon which they intend to rely no later than three (3) calendar days prior to the hearing.  **Failure to timely provide any intended exhibit shall preclude its introduction at the hearing.**  (Emphasis added.)

36.  New York law, which governs the NFL-NFLPA CBA, requires that each "calendar day" must be a "24-hour period."  *See Messina v. Lufthansa German Airlines*, 47 N.Y.2d 111, 116 (N.Y. 1979).

37.  The NFL was thus required to produce the exhibits to be used to support any

suspension by 10 a.m. on June 15, 2012, three calendar days, or 72 hours, prior to the Appeal Hearing.

38.     The NFL failed to produce a single document as required by the CBA.

39.     Finally, on June 15, 2012, at 1:33 p.m., the NFL produced 182 pages of documents, organized into 16 exhibits ("NFL Exhibits"), of the approximately 50,000 pages of documents that the NFL claimed to have gathered and reviewed during its Bounty Program investigation, and a DVD showing part of a single game.

40.     The NFL did not produce a single note taken during any witness interviews or identify the source of any of the documents produced.

41.     The NFL also failed to produce original or unredacted copies of documents but, instead, retyped and otherwise altered documents that it obtained during the investigation and that it supposedly intended to use to satisfy its burden of proof at the Appeal Hearing.

42.     The NFL contended that it was not obligated to produce the evidence it gathered during the investigation, that it was not obligated to produce any exculpatory evidence, and that it was not obligated to produce original or unredacted documents or documents that identify their source or even when they were created.

43.     The NFL failed and refused to produce over 99 per cent of the pages of documents it supposedly gathered.

44.     Approximately 20 per cent of the pages the NFL produced were created *after* Goodell announced Vilma's suspension, including a May 31, 2012 weblog post of Sean Pamphilon, a filmmaker who spent parts of the 2011 season with the Saints, and a June 6, 2012 article in the New Orleans Times-Picayune concerning the Bounty Program investigation.

45.     Thus, the NFL only produced approximately 0.3 per cent of the documents it

allegedly reviewed and on which it based its disciplinary decisions.

46.     No notes of interviews were produced and three of the NFL Exhibits (1, 7 and 10) were transcribed handwritten notes that did not disclose the source of the supposed information or the date on which the documents were created.

***Vilma's Appeal Hearing***

47.     The Appeal Hearing was held on June 18, 2012, at the NFL's offices.

48.     Goodell made clear from the start of the Appeal Hearing that he would serve as the "hearing officer" despite his many public statements in which he provided his own conclusions well in advance of hearing the players' information, despite his many public statements attempting to justify and rationalize the punishments in the weeks prior to the Appeal Hearing and despite the fact that he had been identified as a witness for the hearing.

49.     As further indication that Goodell could not and would not be a fair and neutral arbitrator, the Appeal Hearing from the very beginning was controlled by NFL General Counsel Jeff Pash notwithstanding the fact that the NFL was the party adverse to Vilma and the other players.

50.     Pash, on Goodell's behalf, made clear that none of the witnesses requested by Vilma and the other players who had first-hand knowledge of the facts underlying the allegations would be made available at the Appeal Hearing.

51.     At the outset of the Appeal Hearing,  pursuant to Article 46, § 2(f)(ii) of the NFL-NFLPA CBA, Vilma moved to preclude the NFL from offering any NFL Exhibits based on the NFL's failure to abide by its legal obligation to produce the NFL Exhibits according to the CBA-mandated time schedule.

52.     Despite the fact that Goodell was supposedly serving as a neutral arbitrator,

Goodell conferred with Pash, the NFL's in-house counsel, the NFL's outside counsel, and members of NFL security, and then denied Vilma's motion to preclude the NFL Exhibits.

53.     Based on multiple factors, including the fact that the NFL could not sustain its burden to justify the suspension because it had no documents or evidence it could legally offer at the Appeal Hearing, because it had failed to produce any witnesses with first-hand knowledge of any of the relevant facts, because it had failed to produce the witnesses requested by Vilma, because Goodell by his words and actions prior to the Appeal Hearing had demonstrated that he could not act as a fair and neutral arbitrator, because the NFL had failed to produce well over 99 per cent of the relevant information it had gathered, because the NFL had failed to produce any exculpatory evidence, because the NFL had provided only altered documents and, even for the altered documents, refused to identify the source of the documents or the dates of their creation, and because even under the CBA Goodell lacked jurisdiction to entertain the Appeal Hearing, Vilma moved Goodell to rescind the suspension and dismiss the proceedings.

54.     Goodell refused to rescind the suspension and dismiss the proceedings.

55.     Goodell offered to delay the Appeal hearing for approximately four hours in an effort to remedy the NFL's jurisdictional defect of not producing any documents or evidence in a timely fashion and otherwise refused to address any of the many other defects in the Appeal Hearing and in the process.

56.     In light of Goodell being unable to act as a fair and neutral arbitrator, the NFL's failure to timely produce evidence, failure to produce the requested evidence, failure to produce unaltered evidence, failure to produce witnesses, and other procedural and jurisdictional infirmities, Vilma was prevented from being able to substantively participate in the Appeal Hearing.

57.     By decision dated July 3, 2012, Goodell affirmed his suspension of Vilma.

*The Truth*

58.     Vilma, as a Captain of the Saints defense, was instrumental in leading the Saints to their first-ever Super Bowl championship in the 2009 season and is, at least until Goodell's accusations and allegations were publicly aired, highly regarded as a player and individual throughout the United States and in the State of Louisiana as well as in the professional football community.

59.     Vilma never established, or assisted in establishing, a Bounty Program or any similar program.

60.     Vilma never "embraced" a Bounty Program or any similar program.

61.     Vilma never "targeted" an opposing player for injury.

62.     Vilma never engaged "in unsafe and prohibited conduct intended to injure players."

63.     Vilma never "participate[d] in a program that potentially injured opposing players."

64.     Vilma never paid, or intended to pay, $10,000, or any amount of money, as an incentive to any player to knock Warner, Favre, or any other player, out of the 2009 Divisional Playoff Game, 2010 NFC Championship Game, or any other game.

65.     Vilma never placed $10,000, or any amount of money, on any table or anywhere else as part of a Bounty Program or any other program or for any other reason.

*The NFL's Gross Mischaracterization of Evidence*

66.     Various documents and information upon which the NFL apparently relied in imposing the suspension have become public or otherwise known.   The NFL's gross

13

mischaracterization of these documents and information demonstrates the speciousness of the NFL's claims and suspensions.

67.     Documents the NFL produced, albeit in an untimely fashion, further evidence that the NFL has mischaracterized or is uninformed about the true nature of those documents.

68.     The NFL's alteration of other documents evidences that the NFL cannot substantiate the suspension, and undermines the integrity of the process, as well as the integrity of the NFL and the Commissioner's Office.

**<u>The Hargrove Declaration</u>**

69.     Notwithstanding his claimed role as a fair and neutral arbitrator, in a May 2 Press Release, Goodell claimed that "[Anthony] Hargrove submitted a signed declaration to the league that established not only the existence of the [Bounty] program at the Saints, but also that he knew about and participated in it."

70.     Goodell's characterization of the Hargrove Declaration is grossly inaccurate.

71.     The Hargrove Declaration does not admit or establish in any way the existence of an alleged Bounty Program.  In fact, the Hargrove Declaration details Hargrove's explicit denials of an alleged Bounty Program.

72.     Hargrove attests to the fact that, during meetings and communications with NFL investigators and officials in March 2010, he "repeatedly denied knowledge of any bounty or bounty program."

73.     Because Hargrove swore to facts about which Goodell did not agree, Goodell publicly mischaracterized those facts and punished Hargrove.

74.     Contrary to Goodell's public representations, the Hargrove Declaration cannot possibly "establish" that Hargrove "knew" and "participated" in an alleged Bounty Program.

**Hargrove Video**

75.     The NFL produced, albeit in an untimely manner, "evidence" for the Appeal Hearing which depicted a portion of the Saints' 2009 NFC Championship game against the Minneapolis Vikings.

76.     The video shows Vitt informing the Defensive players that Favre had been injured and was being replaced by a new quarterback.

77.     The NFL contended that Hargrove then could be heard saying, "Bobby, give me my money."  The NFL highlighted that video as one of its strongest pieces of evidence that a Bounty Program existed.

78.     The person heard on the video unequivocally is not Hargrove, nor is it any other player whom the NFL has accused of participating in a Bounty Program.  Moreover, there is no one named "Bobby" whom the NFL has identified as being part of a Bounty Program.  Additionally, the comment had absolutely nothing to do with a Bounty Program nor does it provide any evidence of a Bounty Program.

79.     Upon information and belief, the NFL never even attempted to interview the participants in the videotaped conversation.

**The Ornstein Email**

80.     In a March 21 Press Release, Goodell, notwithstanding his supposed role as a fair and neutral arbitrator, identified an email message from Michael Ornstein as a crucial piece of evidence establishing the existence of a Bounty Program.  Goodell claimed that "prior to the Saints' opening game in 2011, Coach Payton received an email from a close associate [Ornstein] that stated in part 'PS Greg Williams put me down for $5000 on Rogers (sic).'"

81.     Ornstein, who was never a Saints employee, told the NFL that the email was part

of a "running joke," that he never provided any money for a bounty, that, as far as he knows, there was never a Bounty Program, and that he has no knowledge about anyone with the Saints ever funding a bounty of any kind on any opposing player.

82.     Upon information and belief, no one – except Goodell – has ever challenged or investigated Ornstein's explanation of the message.

83.     Also noteworthy, the NFL did not include the Ornstein email among its "evidence" produced, albeit in an untimely manner, for the Appeal Hearing.

84.     Moreover, in his description of the email, Goodell inaccurately claimed that Ornstein sent the email to Payton.  In fact, Ornstein did not send the email to Payton.

### A Second Ornstein Email

85.     The NFL produced for the Appeal Hearing, albeit in an untimely manner, a 2009 email from Ornstein to Williams.  The email, which communicated a promise from Ornstein to send money to Williams, was included among the  "evidence" produced by the NFL of a Bounty Program.

86.     Ornstein communicated directly to Goodell that the email, in fact, concerned Ornstein's contributions to a charitable organization run by Williams, that he had contributed NFL merchandise rather than money to the organization for years, that he no longer had access to NFL merchandise, and he instead was contributing money for the Williams charitable organization.

87.     Ornstein further requested Goodell to corroborate his explanation of the email by obtaining financial documents of Williams' charitable organization that reflected donations.

88.     Upon information and belief, the NFL never sought to obtain financial documents relating to Williams' charitable organization.

16

89.     The NFL, despite producing the Ornstein email, albeit in an untimely fashion, did not produce evidence relating to Ornstein's explanation, any information regarding Williams' charitable organization, or produce Williams or Ornstein at the Appeal Hearing for examination.

**NFL Claims About Bounty Program "Evidence"**

90.     NFL officials have claimed that Ornstein provided evidence that Vilma offered a $10,000 bounty for the injury of Favre.

91.     Ornstein was at the pre-game meeting before the 2009 NFC Championship game where the NFL alleges that Vilma's offer was made.

92.     Ornstein recently stated as follows: "I never corroborated $10,000 … The only thing that I told them was that we had the [pregame] meeting, we jumped around, we screamed around, and I never saw [Vilma offer] one dime.  And I never heard him say it.  Did I say to the league that I saw Jonathan Vilma offer $10,000?  Absolutely not."

93.     Ornstein also has publicly said that he never saw, heard or has any evidence that Vilma offered $10,000 for an injury to Warner or any amount of money as an incentive to injure any other player.

94.     The NFL failed to produce Ornstein to testify at the Appeal Hearing.

95.     The NFL provided no notes of interviews with Ornstein.

96.     The NFL also has identified Vitt as a source of information that a Bounty Program existed, and that Vilma participated in a program designed to award players for injuring opposing players, and that Vitt contributed to the Bounty Program.

97.     Vitt recently stated publicly as follows: "…It cannot be emphasized enough, none of our players, particularly those who are facing suspensions, ever crossed the white line with the intent to injure an opponent."  Vitt equally forcefully denied that Vilma ever offered $10,000 for

an injury to Favre or Warner, or any amount of money for an injury to any player.

98.     Regarding the NFL's contention that Vitt put money into a Bounty Program, Vitt recently stated: "I did not pledge any money for any incentive, pay for performance, bounty or any other alleged program in connection with any game, including the 2010 Championship."

99.     The NFL subsequently retracted its allegation that Vitt put any money into a Bounty Program.

100.    The NFL failed to produce Vitt to testify at the Appeal Hearing.

101.    The NFL provided no notes of interviews with Vitt.

102.    The NFL also identified Williams as providing evidence about a Bounty Program and about Vilma's participation in a Bounty Program.

103.    A close friend and associate of Williams', who has met and spoken extensively with Williams, and who was present for at least one communication Williams had with Goodell, claims as follows: Williams never acknowledged that there existed a Bounty Program, Williams has no information that there existed a Bounty Program, Williams has no information or evidence that Vilma ever offered $10,000 for an injury to Favre or Warner, or any amount of money for an injury to any player.

104.    The same close friend and associate has confirmed that Goodell told Williams that reinstatement depends on Williams' cooperation with Goodell and that Goodell has put a gag order on Williams prohibiting his direct communication with any of the Saints players or officials who have been punished.

105.    The NFL failed to produce Williams to testify at the Appeal Hearing.

106.    The NFL provided no notes of interviews with Williams.

**The Ledger**

18

107.    Upon information and belief, on or about June 1, 2012, Goodell, despite his supposed role as a fair and neutral arbitrator, or an NFL employee or employees, acting on Goodell's behalf, provided a copy of a supposed Ledger to Jason Cole of Yahoo! Sports as supposed evidence of the existence of the Bounty Program.  The Ledger purportedly included two specific entries for the 2009 season:

> a. $1,000 awarded for a "cart-off" during a game against the New York Giants on October 18, 2009; and
>
> b.  Three $1,000 payments awarded for "cart-offs" during a game against the Buffalo Bills on September 27, 2009.

108.    There are serious flaws in both of the alleged Ledger entries.

109.    First, Goodell's allegation against Vilma and the other Saints, and the basis of his claim that there is a Bounty Program, is premised upon a charge that Saints players pledged money in advance of games as an award for injuring pre-designated opposing players.

110.    The supposed Ledger does not in any way evidence that opposing players were targeted for injury or that any money was pledged to award an injury to any opposing player.

111.    Second, Giants offensive tackle Kareem McKenzie suffered a groin injury during the October 18, 2009 game.  McKenzie, as game film evidences, suffered the injury attempting to recover a fumble in a scrum of players.  There is no realistic way in which any Saints defensive player could have intentionally caused McKenzie's groin injury in hopes of earning an alleged Bounty.

112.    Third, after it was publicized, in reaction to the NFL's leak, that no Bills offensive players could have conceivably been the victim of any bounty during the September 27, 2009 game, the NFL revised its leak to Cole and claimed that the Ledger in fact related to a November

8, 2009 game against the Carolina Panthers.

113.    The NFL's revised allegation about the Ledger evidenced was equally specious.

114.    The only Panthers player injured in the November 8, 2009 game was defensive player Thomas Davis.  Davis suffered a knee injury after backpedaling and falling **<u>untouched</u>** by any other player.

115.    Moreover, Goodell's accusation is that the Saints Defensive squad engaged in a Bounty Program.  Davis was hurt playing against the Saints Offensive squad.

116.    Thus, the Ledger could not conceivably evidence that any Saints player could have been involved in intentionally injuring a Panthers player during the November 8, 2009 game or that the Ledger provided evidence of the existence of the Bounty Program.

117.    Despite having made the Ledger available to a member of the media, the NFL did not produce the Ledger, even in an untimely fashion, as part of the Appeal Hearing.

**<u>Cerullo Statements</u>**

118.     Cerullo was an assistant coach with the Saints from 2007 through the 2010 season.  The Saints terminated Cerullo following various incidents, including disappearing from the Club during the 2009 Season and providing a pretextual excuse that was shown to be inaccurate and, again, disappearing from the Club during the week leading up to the Super Bowl in 2010, again giving a pretextual excuse that was shown to be inaccurate.  Following the Saints' Super Bowl victory, Cerullo was given a cubic zirconia Super Bowl facsimile ring rather than a genuine Super Bowl ring, for which Cerullo has strenuously and vehemently expressed his resentment.

119.    Cerullo pledged revenge against the Saints, and particularly against Vitt, following his termination.

20

120.     Upon information and belief, Goodell and the NFL relied principally upon Cerullo's statements during its investigation into the alleged Bounty Program.

121.     Upon information and belief, the NFL interviewed Cerullo multiple times and based its disciplinary decisions largely on Cerullo's statements.

122.     According to a close associate of Cerullo's, who discussed the Bounty Program investigation with Cerullo on multiple occasions, Cerullo retracted his previous claims about the Bounty Program, including in a communication directly with Goodell that occurred in April 2012.

123.     Goodell and the NFL have never disclosed notes of any of their interviews with Cerullo.

124.     Goodell and the NFL have never disclosed any evidence relating to Cerullo's retractions of the allegations about the Bounty Program.

125.     The NFL failed to produce Cerullo as a witness at the Appeal Hearing.

**Saints Defensive Players**

126.     Each of the other Saints and former Saints players whom Goodell has punished has vehemently and unequivocally denied the existence of a Bounty Program.

127.     Each of the other Saints and former Saints players whom Goodell has punished has vehemently and unequivocally denied that any player offered a monetary incentive to injure an opposing player.

128.     There is not a single Saints player or former Saints player who witnessed Vilma offer $10,000 for an injury to Favre or Warner, or any amount of money for an injury to any player.

**Exhibit Number 10**

129.    The NFL produced, albeit in an untimely fashion, a one-page exhibit that it claimed offered irrefutable proof of a Bounty Program and Vilma's participation in the Bounty Program.

130.    The one-page document is inherently suspect.

131.    First, it is a typed document supposedly "transcribed from handwritten notes." The NFL did not produce the original document, did not identify the person who supposedly created the document, did not identify the person who transcribed the document, the document is not dated, the NFL did not identify the date of the creation of the original document, if such a document exists, or of the typed document.

132.    Exhibit 10 is entitled "Minny Game," has the caption "$ $ QB [illegible] Out," and bears the names of several people with words such as "$10,000 QB."

133.    One of those captions is "Vitt -- $5,000 … QB out pool."  Following Vitt's denial that he ever contributed $5,000 or any amount of money to a Bounty Program and denied the existence of a Bounty Program, the NFL finally admitted that Vitt did not put any money into or participate in a Bounty Program.

134.    One of the notations on the list is "QB Grant -- $10,000."  Charles Grant was on injured reserve for the game in question.  Upon information and belief, Grant did not attend the pre-game meeting before the 2009 NFC Championship game, to which Exhibit 10 supposedly relates.

135.    One of the notations on the list is "QB Pool Ornstein -- $10,000."  Ornstein has publicly and vehemently denied that he ever contributed $10,000 or any amount of money to a Bounty Program and has denied the existence of a Bounty Program.

136.    The others identified on Exhibit 10 also have denied ever contributing any amount

of money to a Bounty Program and denied the existence of a Bounty Program, including Roman Harper, Darren Sharper, Fujita, Smith, and Vilma.  No one identified on Exhibit 10 has said that a Bounty Program ever existed.

137.    Upon information and belief, Cerullo created Exhibit 10 well after the 2009 NFC Championship Game and in an effort to gain revenge against the Saints for terminating his employment.

***Objective Facts***

138.    The four players whom Goodell alleges were the leaders and participants of the Bounty Program combined received a total of nine penalties resulting in fines during the three years in which Goodell claims the Bounty Program existed.  Vilma only received two fines during those three years, one for roughing the passer in 2009 and once for grabbing a facemask in 2010.

## CLAIMS FOR RELIEF

### COUNT I
**(Vacatur of the Arbitration Award)**
**(Fundamentally Unfair Arbitration Hearing)**

139.    Vilma repeats and realleges the allegations set forth in Paragraphs 1 through 138 as if fully set forth herein.

140.    The Court is empowered to vacate an arbitration award under both the LMRA and FAA where there is not "a fair and full hearing."  *International Chemical Workers Union v. Columbian Chemicals Co.*, 331 F.3d 491, 496 (5th Cir. 2003).  A fundamentally fair hearing is one that provides "adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator."  *United Steel Workers AFL-CIO v. Murphy Oil USA, Inc.*, 09-cv-7191, 2010 WL 3074322, at *3 (E.D.La. Aug. 3, 2010) (internal quotations and citation omitted).

141.     The NFL failed to produce any evidence in a timely manner as required by the CBA, refusing to produce the evidence requested by Vilma, refusing to produce over 99 per cent of the documents gathered during the NFL's investigation, refusing to produce any notes from witness interviews, refusing to produce exculpatory evidence, refusing to produce unredacted and unaltered evidence, failing to disclose the purported sources of any of its purported evidence, failing to present the purported sources of information or any witnesses with first-hand information for testimony and cross-examination, and refusing to present a neutral and fair arbitrator at the Appeal Hearing.

142.     The supposedly fair and neutral arbitrator at the Appeal Hearing had prejudged the evidence, publicly proclaimed his conclusions in advance of the Appeal Hearing, so vehemently endorsed the allegations against Vilma publicly and in advance of the Appeal Hearing that he could not possibly have acted in a fair and neutral manner, and acted in concert with one of the parties at the Appeal Hearing at Vilma's expense

143.     Vilma could not possibly have defended himself against the NFL's accusations without knowing the scope of the supposed evidence and the source of the supposed evidence upon which the NFL's accusations were based.

144.     The NFL did not provide, and Vilma did not receive, and, with Goodell as the arbitrator could not possibly have received, "a fair and full hearing."

## COUNT II
### (Vacatur of the Arbitration Award)
### (Arbitrary and Capricious Award)

145.     Vilma repeats and realleges the allegations set forth in Paragraphs 1 through 144 as if fully set forth herein.

146.     The Court is empowered to vacate an arbitration award under the LMRA where it

is "arbitrary and capricious." *Braham v. A.G. Edwards & Sons Inc.,* 376 F.3d 377, 383 (5th Cir. 2004). An arbitration award is "arbitrary and capricious when it is so palpably faulty that no judge, or a group of judges, could ever conceivably have made such a ruling." *Berk-Cohen Associates, L.L.C.,* 264 F.Supp.2d 448, 453 (E.D.La. 2003) (citations omitted).

147.    In light of the NFL's failure to produce any evidence in a timely fashion, no judge, or group of judges, could ever conceivably issue a decision that the NFL had sustained its burden of proof despite having produced no evidence and presented no witnesses.

148.    No judge, or group of judges, could ever conceivably issue a decision that the NFL had sustained its burden of proof despite having heard no testimony from persons having first-hand knowledge of the allegations, by relying on undisclosed sources, by relying on transcribed and altered documents, and having denied the accused the right to review nothing more than a scintilla of the evidence.

149.    No system of American justice permits a person to be punished without having had the opportunity to substantively review, investigate and question the evidence and the sources of such evidence presented against him or her.

150.    The NFL violated these basic tenets of American jurisprudence by refusing to produce any evidence in a timely fashion, by refusing to produce the evidence requested by Vilma, by failing to disclose the purported sources of any of its purported evidence, and by failing to present the purported sources for cross-examination at the Appeal Hearing.

151.    The NFL violated these basic tenets of American jurisprudence by allowing a person who previously had publicly pre-judged the merits of the allegations then serve as the arbitrator deciding the matter.

152.    The July 3, 2012 Award is arbitrary and capricious.

## COUNT III
### (Vacatur of the Arbitration Award)
### (The Award Fails to Draw its Essence from the Collective Bargaining Agreement)

153.     Vilma repeats and realleges the allegations set forth in Paragraphs 1 through 152 as if fully set forth herein.

154.     The Court is empowered to vacate an arbitration award under the LMRA when it fails to draw its essence from the collective bargaining agreement. *Teamsters Local No. 5 v. Formosa Plastics Corp.*, 363 F.3d 368, 371 (5th Cir. 2004).

155.     An arbitration award fails to draw its essence from the collective bargaining agreement where the award is not "rationally inferable" from the collective bargaining agreement. *Id.* (citations omitted).

156.     In light of the NFL's failure to produce any documents or evidence in a timely fashion and in light of the NFL's failure to produce or present nearly all of the evidence and the purported sources of that evidence, the Arbitration Award is not rationally inferable from the NFL-NFLPA CBA.

157.     The Arbitration Award is purportedly based on evidence provided by persons whom the NFL refuses to disclose, preventing any possibility of assessing the credibility of the evidence.

158.     The Arbitration Award further fails to draw its essence from the NFL-NFLPA CBA by undermining Vilma's right to effective assistance of counsel during an appeal of Commissioner discipline.    NFL-NFLPA CBA, Art. 46, § 2(b).    The right to counsel contemplated by the NFL-NFLPA CBA necessarily contemplates counsel's ability to review relevant evidence and confront and examine the witnesses or sources of the alleged evidence. The NFL denied Vilma and his counsel these basic rights.

159.    The NFL-NFLPA CBA also does not contemplate or allow for the alteration of evidence.  Goodell fundamentally undermined Vilma's right, as guaranteed by the NFL-NFLPA CBA, to examine the evidence presented against him.

160.    The NFL-NFLPA CBA also does not contemplate or allow for such matters to be adjudicated by a person who has – publicly and unequivocally – prejudged the merits of the dispute.

161.    The July 3, 2012 Decision fails to draw its essence from the NFL-NFLPA CBA.

**COUNT IV**
**(Vacatur of the Arbitration Awards)**
**(Arbitrator's Misconduct)**

162.    Vilma repeats and realleges the allegations set forth in Paragraphs 1 through 161 as if fully set forth herein.

163.    Pursuant to the FAA, 9 U.S.C. § 10(a)(3), the Court is empowered to vacate an arbitration award "where the arbitrator[] w[as] guilty of misconduct… by which the rights of any party have been prejudiced," including where the arbitrator "refus[es] to hear evidence pertinent and material to the controversy."

164.    Goodell was guilty of misconduct by allowing the NFL to fail to produce any documents or evidence in a timely fashion.

165.    Goodell was guilty of misconduct by allowing the NFL to fail to produce or present nearly all of the evidence gathered during the course of the investigation and the purported sources of that evidence.

166.    Goodell was guilty of misconduct by allowing the NFL to refuse to disclose and produce for cross-examination the persons who supposedly provided information to the NFL, thus preventing any possibility of assessing the credibility of the evidence.

167.    Goodell was guilty of misconduct by allowing the NFL to undermine Vilma's right to effective assistance of counsel by denying counsel the ability to review relevant evidence and confront and examine the witnesses or sources of the alleged evidence.

168.    Goodell was guilty of misconduct by allowing the NFL to alter evidence and deny Vilma the right to examine the evidence presented against him.

169.    Goodell was guilty of misconduct by publicly and unequivocally prejudging the merits of the dispute and then serving as the supposed neutral and fair arbitrator of this matter.

170.    Goodell's decision to allow the Appeal Hearing to proceed without regard to the fact that no evidence was produced in a timely fashion and that the NFL in any event did not produce or present the vast body of information gathered during the investigation, or the sources or witnesses of such information, is indistinguishable from an inappropriate and outright refusal to hear the evidence and constitutes misconduct sufficient to vacate the Arbitration Award.

## COUNT V
### (Vacatur of the Arbitration Awards)
### (Arbitrator Exceeded His Authority)

171.    Vilma repeats and realleges the allegations set forth in Paragraphs 1 through 170 as if fully set forth herein.

172.    The Court is empowered to vacate an arbitration award under the LMRA where the arbitrator "exceeds his authority."  *Houston Lighting & Power Co. v. International Brotherhood of Electrical Workers, Local Union No. 66*, 71 F.3d 178, 182 (5th Cir. 1995) (citation omitted).  An arbitrator exceeds his authority by ignoring the "clear and unequivocal" language of the collective bargaining agreement.  *Id.* at 184.

173.    The NFL-NFLPA CBA explicitly bars any evidence at an appeal hearing that is not produced at least three calendar days prior to the hearing.  Goodell ignored this clear and

unequivocal mandate.

174.    In light of the fact that the NFL produced no evidence in a timely fashion there were no grounds upon which the Appeal Hearing could proceed.

175.    By refusing to dismiss the proceedings and, instead, announcing his intention to permit the NFL to introduce the NFL Exhibits at the Appeal Hearing, even though no evidence had been produced three calendar days prior to the Appeal Hearing, Goodell violated the NFL-NFLPA CBA.

176.    Goodell exceeded the authority the NFL-NFLPA CBA granted to the arbitrator.

177.    The NFL-NFLPA CBA also contemplates that a fair and neutral arbitrator preside over an Appeal Hearing.  By publicly pronouncing conclusions about the investigation, publicly pre-judging the Appeal Hearing, and acting in a wholly biased manner, Goodell exceeded his authority granted by the NFL-NFLPA CBA.

178.    The Arbitration Award should be vacated.

## COUNT VI
### (Vacatur of the Arbitration Awards)
### (Arbitrator's Partiality)

179.    Vilma repeats and realleges the allegations set forth in Paragraphs 1 through 178 as if fully set forth herein.

180.    The Court is empowered to vacate an arbitration award under the LMRA where there is "a reasonable impression of partiality."  *United Steel Workers AFL-CIO v. Murphy Oil USA, Inc.*, 09-cv-7191, 2010 WL 3074322, at *3 (E.D.La. Aug. 3, 2010), *quoting Bernstein Seawell & Kove v. Bosarge*, 813 F.2d 726, 732 (5th Cir. 1987).

181.    Pursuant to the FAA, 9 U.S.C. § 10(a)(2), the Court is empowered to vacate an arbitration award  "where there was evident partiality or corruption in the arbitrator[]."

182.    Goodell was the investigator, prosecutor, judge, jury, appellate court and ultimate decision-maker in this process.

183.    Goodell, throughout the investigation of the Bounty Program, made public comments attempting to explain and justify the NFL's actions.

184.    Goodell publicly prejudged the outcome of the Appeal Hearing.

185.    During the course of the Appeal Hearing, Goodell conferred privately with the NFL, its attorneys, investigators, and outside counsel, to the exclusion of Vilma.

186.    Goodell presented no reasonable appearance of impartiality throughout the Appeal Hearing.

187.    Goodell exhibited an impression of partiality throughout the Appeal Hearing.

188.    There is more than a reasonable impression that Goodell was not an impartial arbitrator.

## COUNT VII
### (Injunctive Relief)

189.    Vilma repeats and realleges the allegations set forth in Paragraphs 1 through 188 as if fully set forth herein.

190.    Vilma will suffer real, immediate and irreparable injury in the absence of the injunctive relief sought.  The NFL's suspension of Vilma began immediately upon Goodell's issuance of the Arbitration Award on July 3, 2012.

191.    Under the terms of the suspension, Vilma is prevented from participating in any activities with the Saints, including going to the training facility for rehabilitation and conditioning.

192.    Vilma suffered a serious injury during the 2011 Season and must continue his rehabilitation in order to be sure to continue working in his chosen profession.  Saints trainers,

doctors and coaches are vital to that process.

193.    The Saints' season will begin in earnest in late July with the opening of training camp.  Training camp consists of lengthy practices, weight training sessions, team meetings, scrimmages, studying film, playbooks and more, on an almost daily basis.   Training camp is crucial preparation for the Saints' season, which begins on September 9, 2012.  Being deprived of the fitness program at training camp could expose Vilma to serious injury once he returns to football.

194.    The NFL's decision to bar Vilma from participating in the 2012 season, attending team and individual meetings, training at the Saints' practice facility, spending any time at the Saints' practice facility, attending Saints' games, communicating with teammates and members of the coaching and fitness staff, attending team functions, and collecting his salary will cause Vilma not only to lose his annual salary but also to miss one of the most competitive seasons of his short professional career.

195.    There is no opportunity to "make up" this lost time.  Vilma will simply never have the ability to participate in these lost games and practices again.

196.    The future losses Vilma will suffer cannot be appropriately calculated for purposes of a preliminary injunction because of the snowball effect the NFL's suspension will have on Vilma's reputation, earning potential, standing in the NFL, and potentially devastating consequences to his ability ever to play football again.

197.    A preliminary injunction also would serve the public interest and public policy. Vilma remains an important member of the Saints and is seeking to regain his reputation as a contributing member of the society and fabric of New Orleans.  His absence from the Saints could compromise the Team's success during the upcoming Season and potentially deprive the

Organization of an opportunity to reach its potential by going back to the Super Bowl, hosted in New Orleans, and to reclaim its position as Champions.   Such success would have both emotional and financial importance to the City of New Orleans and surrounding areas.

198.   Vilma has demonstrated a reasonable probability of success on the merits based on the allegations set forth herein.

199.   The balance of equities tips in favor of Vilma rather than the NFL.

200.   Vilma has suffered and will continue to suffer from the NFL's proposed suspension.  Vilma's reputation is forever tainted and his career will be irreparably injured.

201.   The relief sought herein would cause minimal hardship to the NFL because the NFL receives no benefit from the suspension.  Even if the NFL were to prevail on the merits, it could then move forward and institute the suspension upon resolution of this case.

202.   The relief sought herein only seeks to maintain the *status quo*, and provide Vilma with the opportunity to carry on with his livelihood and passion.

203.   Vilma lacks a plain, speedy and adequate remedy at law.  The NFL's threatened sanctions will cause Vilma substantial irreparable injury that cannot be remedied with monetary compensation.

## PRAYER FOR RELIEF

204.   Vilma respectfully requests this Court to enter an order in his favor, granting the following relief:

>   a.   a temporary restraining order and preliminary injunction enjoining the NFL from instituting its suspension against Vilma pending the resolution of this action;
>
>   b.   vacatur of the Arbitration Award; and

c.   such other and further relief as this Court deems just and equitable.

Dated: New York, New York
       July 5, 2012

Respectfully submitted,

PETER R. GINSBERG LAW, LLC


By: s/ Peter R. Ginsberg_____
    Peter R. Ginsberg, *pro hac vice pending*
    12 East 49th Street, 30th Floor
    New York, NY 10017
    (646) 374-0030
    pginsberg@prglaw.com
    *Attorneys for Plaintiff*

Dated: New Orleans, Louisiana
       July 5, 2012

WILLIAMS LAW GROUP, LLC


By: s/ Conrad S. P. Williams, III_____
    Conrad S.P. Williams, III (14499)
    J. Christopher Zainey, Jr. (32022)
    909 Poydras Street, Suite 1625
    New Orleans, LA 70112
    (985) 876-7595
    duke@williamslawgroup.org
    chris@williamslawgroup.org
    *Attorneys for Plaintiff*